STATE OF NORTH CAROLINA v. ROBBIE DEXTER LOCKLEAR

No. 235A96

(Filed 9 October 1998)

### 1. Criminal Law § 122 (NCI4th Rev.)— first-degree murder— arraignment—notice

There was no error in a capital prosecution for first-degree murder where defendant was arraigned one week before he was scheduled for trial and objected on the grounds that his arraignment was not on a calendar published for that session, the trial court continued the proceeding until later in the day, and a calendar containing defendant's arraignment was published in the meantime. Assuming that the State requested a hearing on arraignment outside of defendant's presence, this communication occurred prior to trial and did not constitute a stage of defendant's capital trial. Defendant's right to due process was in no way impaired by a lack of notice, if any; it is clear from the record that defendant was fully aware of the charge against him, he entered a plea of not guilty, and the trial court eliminated the possibility of prejudice by allowing additional time to file defendant's remaining pretrial motions. Assuming that the State violated N.C.G.S. § 15A-943(a) by publishing the calendar for defendant's arraignment on the same day the arraignment was held, there is no reversible error because defendant nonetheless had a full week's interval between arraignment and trial.

**2. Jury § 256 (NCI4th)— first-degree murder—jury selection—*Batson* challenge**

The trial court did not err during jury selection for a capital first-degree murder prosecution by allowing a peremptory challenge against an African-American prospective juror where defendant raised a *Batson* objection, the trial court said, "I understand," and confirmed the race reported on the juror's questionnaire; at that point, forty-seven venire members had been questioned and nine seated, including one black, four Native Americans, and four whites; five blacks had been excused for cause; this juror's excusal made the second peremptory challenge of a black prospective juror by the State; and the State had exercised peremptory challenges against two Native American prospective jurors. Although the trial court did not explicitly rule that defendant had failed to make a *prima facie* showing of discrimination, it is clear from the record that this was the trial court's decision and, defendant having made no other showing to support his *Batson* objection, there was no error.

**3. Jury § 256 (NCI4th)— capital first-degree murder—jury selection—*Batson* challenge**

The trial court did not err during jury selection for a capital first-degree murder prosecution by denying defendant's *Batson* claim as to three jurors where the reasons articulated by the prosecutor were supported by the record. Prospective juror Hester indicated that she had four relatives who were currently or had been in jail or prison; Ms. Locklear admitted to pleading guilty to possession of marijuana; Ms. Brooks expressed her opposition to the death penalty and the State exercised its peremptory challenge after the trial court had twice denied a challenge for cause; and defendant's only rebuttal was that the State had passed several white jurors despite drug and DWI convictions. The North Carolina Supreme Court has previously rejected an attempt to show discriminatory intent by finding a single factor among several articulated by the prosecutor and matching it to a passed juror who exhibited that same factor. Here, the prosecutor pointed to Ms. Locklear's demeanor as well as her prior drug conviction as the basis for the challenge.

STATE v. LOCKLEAR

[349 N.C. 118 (1998)]

**4. Jury § 256 (NCI4th)— first-degree murder—jury selection—*Batson* challenge—no prima facie case**

The trial court's finding in a capital prosecution for first-degree murder that defendant failed to make a *prima facie* showing of discrimination as to the State's peremptory challenges of two jurors was not clearly erroneous where the court noted that the two prospective jurors were not of the same race as defendant and defendant asserted that the two prospective jurors were members of a minority race who were asked the same questions and gave the same responses as white jurors who were passed by the State. Defendant's standing to assert a *Batson* claim is not impaired by the fact that he is of a different race than the challenged jurors, but the race of a defendant and the race of the victim and key witnesses are relevant circumstances that the trial court may consider when determining whether defendant had raised an inference of purposeful discrimination sufficient to make a *prima facie* case upon a *Batson* motion. Furthermore, disparate treatment of prospective jurors is not necessarily dispositive of discriminatory intent.

**5. Jury § 256 (NCI4th)— first-degree murder—jury selection—*Batson* challenge—Native American and African-American prospective jurors considered separately**

There was no violation of the Equal Protection Clause in jury selection for a capital first-degree murder prosecution where the trial court considered defendant's *Batson* motion separately as to challenged Natice American and African-American prospective jurors. Racial identity between defendant and some of the challenged jurors was a legitimate factor for the trial court to consider in ruling on defendant's *Batson* motion and the fact that defendant and the challenged black jurors were of different races was a relevant circumstance which the trial court was also entitled to weigh. The trial court may consider the acceptance rate of minority jurors by the State as evidence bearing on alleged discriminatory intent and defendant's contention that the trial court unduly emphasized this factor is rejected.

**6. Jury § 93 (NCI4th)— first-degree murder—jury selection—objections to question sustained**

The trial court did not abuse its discretion during jury selection for a capital first-degree murder prosecution by sustaining objections to questions which defendant contended prevented

him from questioning prospective jurors concerning the credibility of law enforcement officers. The record reveals that defense counsel was allowed the opportunity to rephrase the questions and that the trial court gave defendant ample opportunity to inquire into jurors' potential bias in favor of law enforcement.

**7. Jury § 149 (NCI4th)— first-degree murder—jury selection—inquiry into automatic vote for death penalty—no abuse of discretion**

There was no abuse of discretion during jury selection for a capital first-degree murder prosecution where defendant contended that the court limited *voir dire* concerning whether jurors would automatically vote for the death penalty, but he was permitted to pursue this line of inquiry with direction from the court to rephrase certain questions.

**8. Jury § 222 (NCI4th)— first-degree murder—jury selection—death qualification—no error**

There was no error during jury selection for a capital first-degree murder prosecution where the prospective jurors excused for cause based on their responses to questions concerning capital punishment were not able to state clearly that they could set aside personal opposition to the death penalty and render a verdict in accordance with the law and the evidence in the case.

**9. Jury § 183 (NCI4th)— first-degree murder—jury selection—challenge for cause**

There was no error during jury selection for a capital first-degree murder prosecution where defendant contended that the court erred by not excusing a prospective juror for cause based on the juror's inability to be impartial in weighing the credibility of law enforcement officers but that venire member was in fact ultimately dismissed for cause.

**10. Jury § 118 (NCI4th)— first-degree murder—jury selection—no expression of opinion by judge**

The trial judge during jury selection for a capital first-degree murder prosecution did not improperly and prejudicially convey an opinion by his conduct and participation, by his examination of witnesses, by his nonverbal conduct, and by his comments. There was nothing in those portions of the record to which defendant pointed that suggested that the judge's comments or

questions improperly influenced jurors or disparaged defense counsel and, because prospective jurors were examined individually, no possible prejudicial impact could have occurred as a result of the judge's remarks to defense counsel during the questioning of persons ultimately excused.

**11. Criminal Law § 376 (NCI4th Rev.)— first-degree murder—guilt phase—relevance of line of questioning—judge's remarks**

There was no error and no prejudicial effect on the jury during the guilt phase of a capital first-degree murder prosecution where defendant contended that the court's questions and conduct were improper during an exchange with defense counsel, but the judge conducted a proper inquiry into the relevance of defendant's line of questioning so as to prevent inadmissible evidence from being presented to the jury and the exchange took place outside the presence of the jury.

**12. Criminal Law § 376 (NCI4th Rev.)— capital first-degree murder—judge's comments—relevancy of evidence**

The jury in a capital first-degree murder prosecution was not improperly influenced and defendant was not denied his right to a fair trial where the court remarked on the relevancy of certain evidence.

**13. Criminal Law § 381 (NCI4th Rev.)— capital sentencing—judge's comments—no error**

There was no error in a capital sentencing proceeding where defendant contended that the court improperly commented on the evidence, but the court in fact in one instance was acting upon defendant's objection to the State's attempt to offer a certified copy of defendant's criminal record rather than the judgment, and in another instance did no more than interpose a clarifying question. There was no objectionable intimation of opinion as to the witnesses' credibility, defendant's culpability, or any factual controversy to be decided by the jury.

**14. Criminal Law § 381 (NCI4th Rev.)— first-degree murder—judge's comments—no error**

There was no error in a capital first-degree murder prosecution where defendant contended that the trial court assisted and coaxed the prosecutor, made objections to questions by the defense, sustained its own objections, and belittled defense coun-

sel, but the inquiries to attorneys for both sides as to their desire to object to potentially inadmissible testimony did not constitute coaxing the prosecutor or making objections to questions by the defense and did not indicate that the court was rude to or belittled defense counsel.

**15. Evidence and Witnesses § 1767 (NCI4th)— first-degree murder—test of murder weapon—admissible**

The trial court did not err in a capital first-degree murder prosecution by admitting the testimony of an SBI expert in firearms where defendant contended that the witness's test with the murder weapon to determine muzzle to target distances based on shotgun-pellet patterns was not conducted under circumstances sufficiently similar to conditions at the time of the crime. The agent used the same .12-gauge shotgun that fired the fatal shots, used ammunition consistent with ammunition recovered at the scene, the purpose was to determine the distance at which the gun was fired, and the agent was well qualified by his knowledge, training and the experience to conduct these tests and render an expert opinion.

**16. Evidence and Witnesses § 2273 (NCI4th)— first-degree murder—testimony of pathologist—shotgun wound pattern**

The trial court did not err in a capital first-degree murder prosecution by admitting the testimony of an expert forensic pathologist that a shot pattern that corresponded with test firing a shotgun from the three-foot range most closely matched the wound in the victim's back as well as his expert opinion of the effect on a body of such a shot. The witness performed the autopsy on the victim, examined and measured the wounds, and reviewed and measured the shotgun-pellet test patterns. He was undoubtedly in a position to assist the jury in determining the distance from which the fatal shots were fired and his testimony illustrating the effect such a shot would have had was likewise appropriate to assist the jury in understanding the evidence.

**17. Evidence and Witnesses § 2309 (NCI4th)— first-degree murder—victim's blood alcohol level—pathologist's opinion of alcohol intake—admissible**

The trial court did not err in a capital first-degree murder prosecution by admitting the testimony of an expert forensic

pathologist that the victim's blood alcohol level would have been the result of the ingestion of approximately one-half of a beer. The witness personally drew the blood sample from the victim during the autopsy and incorporated the results into the autopsy report, the witness measured the victim's height and weight and noted an amount of partially digested food in the victim's stomach, and, based on his training, knowledge, and experience, gave his opinion to a reasonable medical certainty of the amount of alcohol that was absorbed into the victim's blood stream.

**18. Evidence and Witnesses § 3164 (NCI4th)— first-degree murder—witness's prior statement to police—admissible**

The trial court did not err during a capital first-degree murder prosecution by admitting the prior statement of a witness to officers on the night of the shooting where the prior statement was consistent with the witness's trial testimony, contained no significant additional facts, and the court gave proper instructions limiting the evidence to corroboration.

**19. Evidence and Witnesses § 716 (NCI4th)— first-degree murder—hearsay testimony—not prejudicial**

There was no prejudice in a capital first-degree murder prosecution from testimony by a witness as to how he had come to live in the victim's home, even assuming that the testimony consisted of inadmissible hearsay.

**20. Evidence and Witnesses § 694 (NCI4th)— first-degree murder—evidence excluded—not preserved for review**

A defendant in a capital first-degree murder prosecution who argued that evidentiary rulings by the trial court denied him the right to present a defense could not show prejudice because the record fails to show what the answers would have been had the witnesses been permitted to respond.

**21. Criminal Law § 504 (NCI4th Rev.)— first-degree murder— jury deliberations—taking evidence into jury room**

The trial court did not err in a capital prosecution for first-degree murder by refusing to allow the jury to review the testimony of a particular witness and instructing them to remember the testimony as it was given in the courtroom.

**22. Criminal Law § 503 (NCI4th Rev.)— capital first-degree murder—jury deliberations—defendant's statement taken into jury room—no error**

There was no prejudicial error in a capital first-degree murder prosecution where the trial court granted the jury's request to take defendant's statement into the jury room. Although defendant contends that he was not given the opportunity to object to the submission of the exhibit to the jury, the record reveals no action by the trial court which prevented defendant from making such an objection or otherwise indicating his lack of consent and there was no prejudice in that defendant's statement had previously been admitted into evidence, read to the jury in its entirety, and published individually to jurors.

**23. Criminal Law § 467 (NCI4th Rev.)— capital murder—prosecutor's arguments—use of shotgun—basis in evidence**

There was no error during the guilt phase of a capital first-degree murder prosecution where the prosecutor argued that the twelve-gauge shotgun used in the murder had to be loaded, closed, fired, and unloaded. The prosecutor argued that the very act of loading and firing the weapon showed premeditation and deliberation, a reasonable inference from the evidence. The shotgun had been introduced as evidence and the mechanics of loading and firing it were based directly upon the evidence.

**24. Criminal Law § 436 (NCI4th Rev.)— capital first-degree murder—prosecutor's argument—defendant's choices**

There was no error in the guilt phase of a capital first-degree murder prosecution where the prosecutor argued that defendant was there because of the choices he had made and that the jury should not let the defense put that fault or blame on the jury.

**25. Criminal Law § 475 (NCI4th Rev.)— capital first-degree murder— prosecutor's argument—heat of passion**

There was no error in the guilt phase of a capital first-degree murder prosecution where the prosecutor argued that there was no heat of passion involved in the case and that there would be no instruction on self-defense where the record showed that the trial court gave instructions only on first- and second-degree murder, not manslaughter, and not on self-defense, so that the prosecutor's assertions were correct. The prosecutor did not misstate the law, distort the evidence, or inflame or prejudice the jury.

**26. Criminal Law § 448 (NCI4th Rev.)— capital first-degree murder—prosecutor's argument—jury as voice of the community**

There was no error in the guilt phase of a capital first-degree murder prosecution where the prosecutor argued to the jury that the jury was the voice of the community and represented the community.

**27. Homicide § 706 (NCI4th)— first-degree murder—instruction on voluntary manslaughter refused**

There was no prejudicial error in a capital prosecution for first-degree murder in not granting defendant's request for a jury instruction on voluntary manslaughter where, assuming that the evidence warranted the instruction, the jury's verdict of first-degree murder and its rejection of second-degree murder renders any error harmless.

**28. Homicide § 609 (NCI4th)— first-degree murder—instruction on self-defense refused—no error**

The trial court did not err in a capital first-degree murder prosecution by failing to instruct on self-defense where defendant in his own statement acknowledged that the victim was unarmed when defendant shot him in the back and defendant offered no evidence that, at the time of the shooting, he believed, reasonably or unreasonably, that it was necessary to kill the victim in order to protect himself from imminent death or great bodily harm.

**29. Criminal Law § 1342 (NCI4th Rev.)— capital sentencing—prior record—certified copy of record**

The trial court did not err in a capital sentencing proceeding by allowing the State to put before the jury defendant's criminal record before admitting the judgment of defendant's prior felony conviction as proof of the aggravating circumstance of a previous conviction of a felony involving violence. The State offered a certified copy of defendant's record, defendant objected, and the court allowed the prosecutor to withdraw the copy of defendant's criminal record and substitute the judgment, with the testimony of the deputy clerk laying the foundation for the admission of the judgment. While the prosecutor initially proffered a copy of defendant's criminal record, it was never admitted into evidence or "put before the jury," and the court ruled appropriately in

STATE v. LOCKLEAR

[349 N.C. 118 (1998)]

requiring the State to prove the sole aggravating circumstance by the preferred method, introduction of the judgment itself. Although defendant contends that the mere proffer of his criminal record insinuated to the jury that he had an extensive criminal history, defendant's bare assertion of prejudice is unsupported by the record.

**30. Evidence and Witnesses § 2877 (NCI4th)— capital first-degree murder—defendant's expert witnesses—cross-examination**

The trial court in a capital first-degree murder prosecution did not abuse its discretion in overruling defendant's objections to the cross-examination of defendant's expert witnesses where, without identifying how any specific question exceeded the permissible scope of cross-examination, defendant merely referred to portions of the transcript and generally labeled the cross-examination abusive and insulting. A careful inspection of the record reveals no prejudicial error and that the questions were within the scope of permissible cross-examination.

**31. Evidence and Witnesses § 2877 (NCI4th)— first-degree murder—forensic psychologist—cross-examination**

The cross-examination of defendant's forensic psychologist in a capital first-degree murder prosecution was not abusive, insulting, and degrading and was not intended to distort his testimony, as defendant contended. He was interrogated as to the amount and method of the computation of his fee, a legitimate subject of cross-examination, and, while defense objections were overruled to questions concerning how the witness arrived in that county for the trial, the number of capital trials at which he had previously testified, and what he did while administering a test to defendant, nothing suggests abusive or improper interrogation and there was no untoward or bad faith questioning.

**32. Criminal Law § 1342 (NCI4th Rev.)— capital sentencing—prior conviction involving violence—testimony as to nature of conviction—admissible**

The trial court did not abuse its discretion during a capital sentencing proceeding by admitting the testimony of a detective that the victim in defendant's prior assault conviction had been confined to a wheelchair at the time of the assault. The testimony simply conveyed the circumstances of defendant's prior conviction, which had already been introduced as evidence, and the

record reveals no prejudicial insinuations flowing from this testimony.

### 33. Criminal Law § 1335 (NCI4th Rev.)— capital sentencing—defendant's evidence excluded—no error

The trial court did not err during a capital sentencing proceeding by excluding evidence upon the prosecutor's objection which defendant contended was admissible mitigating evidence. One instance warrants discussion: defendant sought to attack the character of the victim of his prior assault conviction, but the State proved the existence of the prior felony aggravating circumstance by submitting the judgment and the testimony of the investigating officer and the prior victim did not appear at trial and was not a hearsay declarant subject to impeachment. Nothing in the criminal record of the prior victim sheds light on defendant's age, character, education, environment, habits, mentality, propensities, or criminal record or on the circumstances of the offense for which defendant was being sentenced.

### 34. Criminal Law § 1392 (NCI4th Rev.)— capital sentencing—mitigating circumstance—victim as voluntary participant—not submitted

The trial court did not err in a capital sentencing proceeding by refusing to submit the statutory mitigating circumstance that the victim was a voluntary participant in defendant's homicidal conduct where defendant contended that the victim provoked a fight with defendant, but defendant was getting the best of the victim in the fight and the victim had stopped before defendant reentered the mobile home to get his shotgun. Defendant presented no evidence that he knew the victim kept a weapon in the shed toward which the victim was moving or that the victim reinitiated the fight. It is undisputed that defendant's homicidal conduct consisted of retrieving a shotgun from inside that mobile home, shooting the victim in the back, and firing at the victim again as he was lying on the ground. N.C.G.S. § 15A-2000(f)(3).

### 35. Criminal Law § 1392 (NCI4th Rev.)— capital sentencing—nonstatutory mitigating circumstance—not submitted as requested

The trial court did not err in a capital sentencing proceeding by not submitting a nonstatutory mitigating circumstance as originally proposed by defendant where the circumstance that was actually submitted, along with the catchall mitigating circum-

stance, allowed the jury to consider and give weight to all the evidence presented on this subject.

**36. Criminal Law § 1392 (NCI4th Rev.)— capital sentencing— nonstatutory mitigating circumstances—defendant's support by relatives**

The trial court did not err in a capital sentencing proceeding by excluding the proposed nonstatutory mitigating circumstance that defendant continues to have family members who care for and support him; the feelings, actions, and conduct of third parties have no mitigating value as to defendant and are irrelevant.

**37. Criminal Law § 685 (NCI4th Rev.)— capital sentencing— peremptory instructions—not requested**

The trial court did not err in a capital prosecution for first-degree murder by refusing to give peremptory instructions on all the statutory and several nonstatutory mitigating circumstances where defendant did not request peremptory instructions during the charge conference and only raised the issue just prior to closing arguments in the penalty phase of the trial. Defendant did not make a specific request for peremptory instructions, nor did he make a showing that the evidence supporting any mitigating circumstance was uncontroverted and manifestly credible, but merely raised the issue of peremptory instructions before the trial court.

**38. Criminal Law § 1392 (NCI4th Rev.)— capital sentencing— nonstatutory mitigating circumstance—requested circumstance submitted**

Although the defendant in a capital sentencing proceeding argued that the trial court erred by failing to submit and instruct the jury on a nonstatutory mitigating circumstance after agreeing to submit the circumstance, the record reveals that defendant initially requested two nearly identical nonstatutory circumstances and agreed to the submission of only one during the charge conference. That mitigating circumstance was in fact submitted and instructed upon.

**39. Criminal Law § 460 (NCI4th Rev.)— capital sentencing— prosecutor's arguments—not grossly improper**

Certain of the prosecutor's arguments in a capital sentencing proceeding were not so grossly improper as to require the trial court to intervene *ex mero motu*. In addition to the wide latitude generally afforded trial counsel in jury arguments, the prosecutor of a capital case has a duty to zealously attempt to persuade the jury that the death penalty is appropriate upon the facts presented.

**40. Criminal Law § 471 (NCI4th Rev.)— capital sentencing— prosecutor's argument—not supported by evidence—not prejudicial**

Most of a first-degree murder defendant's contentions that the trial court erred by allowing certain arguments by the prosecutor in a capital sentencing hearing were without merit. While there was no evidence to support the prosecutor's assertion that the victim's son saw his father after the shooting, the evidence clearly established the son's proximity to the scene and the prosecutor's statement, though inappropriate, was not prejudicial.

**41. Criminal Law § 461 (NCI4th Rev.)— capital sentencing— prosecutor's argument—deterence**

There was no error in a capital sentencing proceeding where the court allowed the prosecutor to urge the jury to "save someone else's life"; to never "let him put his hands on another gun or another knife and face down another human being who has made him mad"; that prison would not do defendant any good; and that the death penalty would prevent defendant from taking another life. Arguments invoking specific deterrence are proper.

**42. Criminal Law § 461 (NCI4th Rev.)— capital sentencing— prosecutor's argument—specific deterrence—not a comment on appellate process**

There was no error in a capital sentencing proceeding where the trial court denied defendant's motion for a mistrial after the prosecutor argued "You've got to stop this now, ladies and gentlemen. And only you can do it. Don't pick up the paper somewhere down the road and read about a new trial of [defendant]." The trial court correctly interpreted the argument as an extension of the specific deterrence argument as to defendant rather than a comment on the appellate process.

STATE v. LOCKLEAR

[349 N.C. 118 (1998)]

**43. Criminal Law § 460 (NCI4th Rev.)— capital sentencing— prosecutor's argument—passion, prejudice, or other arbitrary factor**

The prosecutor's arguments in a capital sentencing proceeding did not result in a verdict of death returned under the influence of passion, prejudice, or other arbitrary factors where the defendant's assertions that certain arguments were grossly improper were meritless.

**44. Appeal and Error § 341 (NCI4th)— capital first-degree murder—preservation issues—not properly raised**

Certain of a capital first-degree murder defendant's preservation issues were in fact not proper preservation issues because they were not determined solely by principles of law upon which the court had previously ruled. Where counsel determines that an issue does not have merit, it should be omitted entirely from the argument on appeal, furthermore, some of the issues were not addressed by any argument or authority whatsoever and assignments of error in support of which no reasonable argument is stated will be taken as abandoned.

**45. Criminal Law § 1402 (NCI4th Rev.)— death penalty—supported by record—not under the influence of passion, prejudice, or other arbitrary considerations**

A sentence of death in a first-degree murder prosecution was not imposed under the influence of passion, prejudice, or any other arbitrary consideration and the record fully supports the sole aggravating circumstance found by the jury.

**46. Criminal Law § 1402 (NCI4th Rev.)— death penalty—not disproportionate**

A death penalty for first-degree murder was not disproportionate where defendant shot his unarmed stepfather in the back and fired the gun twice more as the victim was lying on the ground. The evidence presented at trial as to the circumstances of defendant's previous conviction revealed a knife attack on a victim confined to a wheelchair and defendant in this case was convicted of first-degree murder under the theory of premeditation and deliberation.

Justice WYNN did not participate in the consideration or decision of this opinion.

STATE v. LOCKLEAR

[349 N.C. 118 (1998)]

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Britt (Joe Freeman), J., at the 29 April 1996 Criminal Session of Superior Court, Robeson County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 9 February 1998.

*Michael F. Easley, Attorney General, by David F. Hoke, Assistant Attorney General, for the State.*

*William L. Davis, III, for defendant-appellant.*

FRYE, Justice.

Defendant was indicted by a Robeson County grand jury for the first-degree murder of James Charles Taylor. He was tried capitally, and the jury returned a verdict of guilty of first-degree murder. In a capital sentencing proceeding conducted pursuant to N.C.G.S. § 15A-2000, the jury found as an aggravating circumstance that defendant had previously been convicted of a felony involving the use of violence to the person. No juror found any mitigating circumstance. The jury recommended and the trial court imposed a sentence of death. For the reasons discussed herein, we conclude that defendant's trial and capital sentencing proceeding were free of prejudicial error and that the death sentence is not disproportionate. Accordingly, we uphold defendant's conviction of first-degree murder and sentence of death.

The State's evidence presented at trial tended to show the following facts and circumstances. On 27 January 1994, defendant and the victim, James Charles "Jay" Taylor, were living in the same mobile home in Robeson County. Also living in the home were defendant's mother, Angelina Locklear Taylor, who was the victim's wife; defendant's stepbrother, James Reed "J.R." Taylor, who was the victim's son; and defendant's uncle, James B. Locklear, Jr. That evening, defendant and his stepbrother were inside the bedroom they shared in the home. According to defendant's statement, Jay Taylor came into the room and began "raising hell" with defendant. Taylor invited defendant outside, and a fight ensued. Defendant was "getting the best of him," and Taylor stopped. Taylor moved toward an outside storage shed, telling defendant, "I will be right back you son of a bitch."

Defendant reentered the mobile home, got a twelve-gauge shotgun and shells, and returned outside. Taylor was standing in front of

the storage shed, and defendant shot him in the back from a distance of approximately three to eight feet. Defendant reloaded the shotgun and shot Taylor in the neck as he was lying on the ground, then reloaded and fired a third time, missing the victim. Taylor died as a result of the two gunshot wounds inflicted by defendant.

Defendant had been drinking beer and liquor during the day of the shooting. An autopsy showed that the victim had a blood- alcohol level of .02, the equivalent of approximately half a beer.

After the shooting, defendant again entered the mobile home and told his uncle, "You better go check on your brother-in-law." Defendant told his uncle that he had shot Taylor because Taylor "said he was an S.O.B. and his mother was, too." Defendant then went across the street and told his aunt, Vera Lindsey, what he had done. Defendant ran down the road, where he was found by his cousin, James Belton Locklear, about a mile away. Locklear drove defendant back to the scene and summoned police. After being advised of his rights and waiving them, defendant voluntarily gave a statement to Detective Randal Patterson of the Robeson County Sheriff's Department in which he admitted shooting Taylor. Defendant's statement was published to the jury.

The trial court denied defendant's motion to dismiss made at the close of the State's evidence.

Defendant did not testify but did present evidence at trial. J.R. Taylor, the victim's son, testified that his father came into the bedroom he shared with defendant and asked him to go into another room. J.R. heard loud talking and a few minutes later he heard a shot, but did not think anything of it because target shooting was common in the neighborhood. Two of defendant's relatives testified that the victim kept one or more guns in the shed or outbuilding behind the mobile home. Mrs. Taylor, defendant's mother, testified that a week after her husband's death, she found a rifle while cleaning out the shed. She also testified that when she saw defendant at the jail on the night of the shooting he was upset and crying.

At defendant's capital sentencing proceeding, the State presented evidence of defendant's prior conviction for assault with a deadly weapon inflicting serious injury in support of the sole aggravating circumstance submitted to the jury, that defendant had been previously convicted of a felony involving the use of violence to the person. N.C.G.S. § 15A-2000(e)(3) (1988) (amended 1994).

Defendant's evidence during the sentencing phase tended to show the following: Defendant's mother had abused alcohol before and during her pregnancy. There was evidence that defendant suffered from Fetal Alcohol Syndrome. Defendant was an illegitimate child who had no contact with his father. Defendant was cared for by his grandmother from an early age because his mother continued to drink heavily. He was close to his grandmother and cared for her during her final illness, until she died when defendant was approximately nine years old.

There was expert testimony that defendant had an IQ of 76, which placed him in the borderline range of intellectual functioning. Defendant had always been small for his age and was "slow" in school. He had been retained in school and, as a teenager, had dropped out. Defendant also began to abuse alcohol as a teenager. He suffered from impulsive behavior and feelings of insecurity, inadequacy, and dependency, in part because of the effects of his exposure to alcohol before birth. At the time of the shooting, defendant was intoxicated from alcohol, Valium, and marijuana.

The jury considered twenty-one mitigating circumstances based on this evidence and the catchall mitigating circumstance. No juror found any mitigating circumstance to exist. The jury unanimously recommended, and the trial court imposed, a sentence of death.

Defendant appeals to this Court as of right from the sentence of death and presents thirty issues based on seventy-three assignments of error.

[1] Defendant first contends that the trial court erred by arraigning him in violation of the procedures mandated by N.C.G.S. § 7A-49.3. Defendant was arraigned on 22 April 1996, at a Mixed Session of Superior Court, Robeson County, one week before he was scheduled for trial. On the day of the hearing, defendant objected on the grounds that his arraignment was not on a calendar published for that session. The trial court continued the proceeding until later in the day, and in the meantime, a calendar containing defendant's arraignment was published. Defendant contends that his constitutional right to due process was violated because the arraignment was scheduled pursuant to an *ex parte* communication between the trial court and the prosecutor, because he was not given proper notice of the arraignment, and because he was denied the full statutorily required time to file pretrial motions. We reject these contentions.

First, defendant's allegation of an *ex parte* communication between the trial court and the prosecutor implies that his constitutional right to presence was violated in some manner. At most, the record indicates that the prosecutor requested a hearing on an arraignment. While it is well settled that a defendant has an unwaivable right to be present at every stage of his capital trial, *see State v. Payne*, 320 N.C. 138, 139, 357 S.E.2d 612, 612 (1987), a defendant does not have a right to be present when the State makes a routine communication with the court, prior to trial, concerning a scheduling matter. Assuming the State requested a hearing on arraignment outside of defendant's presence, this communication occurred prior to trial and did not constitute a stage of his capital trial. *Cf. State v. Buckner*, 342 N.C. 198, 228, 464 S.E.2d 414, 431 (1995) (no error where conference between trial judge and counsel was held without defendant's presence prior to commencement of trial), *cert. denied,* —— U.S. ——, 136 L. Ed. 2d 47 (1996).

Second, defendant's right to due process was in no way impaired by a lack of notice, if any, that the arraignment was to be held on 22 April 1996. An arraignment is "a proceeding whereby a defendant is brought before a judge having jurisdiction to try the offense so that the defendant may be formally apprised of the charges pending against him and directed to plead to them." *State v. Smith*, 300 N.C. 71, 73, 265 S.E.2d 164, 166 (1980); *see* N.C.G.S. § 15A-941 (1997). It is clear from the record that defendant was fully aware of the charge against him, and he entered a plea of not guilty to first-degree murder at the arraignment. Further, defendant was not prevented, by the holding of his arraignment on this date, from filing pretrial motions. The trial court eliminated any possibility of prejudice by allowing defendant additional time to file his remaining pretrial motions.

Finally, defendant's contention that the State violated N.C.G.S. § 15A-943, thereby prejudicing him, is also meritless. Defendant was arraigned on 22 April 1996, and his trial began on 29 April 1996. This Court has determined that a defendant's interest in N.C.G.S. § 15A-943 arises under subsection (b), which provides that a defendant may not be tried without his consent in the same week in which he is arraigned. *State v. Richardson*, 308 N.C. 470, 482, 302 S.E.2d 799, 806 (1983); *State v. Shook*, 293 N.C. 315, 319, 237 S.E.2d 843, 846 (1977). Thus, defendant's "only interest is in his vested right to a week's interval between his arraignment and trial." *Richardson*, 308 N.C. at 483, 302 S.E.2d at 807. Assuming, *arguendo*, that the State violated N.C.G.S. § 15A-943(a) by publishing the calendar for defend-

ant's arraignment on the same day the arraignment was held, there is no reversible error because defendant nonetheless had a full week's interval between arraignment and trial. *Id.* at 482-83, 302 S.E.2d at 806-07.

[2] We next examine defendant's assignments of error pertaining to the jury selection process. Defendant first argues that the trial court erred by allowing the prosecution to peremptorily excuse black and Native American prospective jurors on the basis of race. The use of peremptory challenges for racially discriminatory reasons violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986). The North Carolina Constitution, Article I, Section 26, also prohibits the exercise of peremptory strikes solely on the basis of race. *See State v. Ross*, 338 N.C. 280, 284, 449 S.E.2d 556, 560 (1994).

Upon making an objection under *Batson*, a defendant must first make out a *prima facie* case of racial discrimination, which he may do by showing: "(1) he is a member of a cognizable racial minority, (2) members of his racial group have been peremptorily excused, and (3) racial discrimination appears to have been the motivation for the challenges." *State v. Porter*, 326 N.C. 489, 497, 391 S.E.2d 144, 150 (1990). Defendant is a Native American. We recognize that "[w]here defendant is an American Indian, people of this heritage are a racial group cognizable for *Batson* purposes." *Id.* at 499, 391 S.E.2d at 151. However, a defendant also has standing to complain that a prosecutor has used the State's peremptory challenges in a racially discriminatory manner even if there is not racial identity between the defendant and the challenged juror. *Powers v. Ohio*, 499 U.S. 400, 113 L. Ed. 2d 411 (1991); *see also State v. Beach*, 333 N.C. 733, 430 S.E.2d 248 (1993). Thus, defendant, although Native American, is not prohibited from challenging the excusal of black prospective jurors on the basis of race.

If a defendant succeeds in making a *prima facie* showing of discrimination, the burden shifts to the State to come forward with a race-neutral reason for each challenged peremptory strike. *State v. Robinson*, 330 N.C. 1, 16, 409 S.E.2d 288, 296 (1991). The rebuttal must be clear, reasonably specific, and related to the particular case to be tried, but " 'need not rise to the level justifying exercise of a challenge for cause.' " *State v. Robinson*, 336 N.C. 78, 93, 443 S.E.2d 306, 312 (1994) (quoting *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88),

*cert. denied,* 513 U.S. 1089, 130 L. Ed. 2d 650 (1995). A defendant is then entitled to present evidence to show that the prosecutor's explanations are a pretext. *State v. Gaines,* 345 N.C. 647, 668, 483 S.E.2d 396, 408, *cert. denied,* —— U.S. ——, 139 L. E. 2d. 177 (1997).

Where the trial court rules that a defendant has failed to make a *prima facie* showing, our review is limited to whether the trial court erred in finding that the defendant failed to make a *prima facie* showing, even if the State offers reasons for its exercise of the peremptory challenges. *State v. Hoffman,* 348 N.C. 548, 554, 500 S.E.2d 718, 722-23 (1998); *State v. Williams,* 343 N.C. 345, 359, 471 S.E.2d 379, 386-87 (1996), *cert. denied,* —— U.S. ——, 136 L. Ed. 2d 618 (1997). On the other hand, where the trial court rules that a defendant has made an initial *prima facie* showing of discrimination, it is the responsibility of the trial court to make appropriate findings as to whether the prosecution's stated reasons are a credible, nondiscriminatory basis for the challenges or simply pretext. Then the issue before this Court is whether the trial court properly determined whether or not the defendant had proven purposeful discrimination. "Because the trial court is in the best position to assess the prosecutor's credibility, we will not overturn its determination absent clear error." *State v. Cummings,* 346 N.C. 291, 309, 488 S.E.2d 550, 561 (1997), *cert. denied,* —— U.S.——, 139 L. Ed. 2d 873 (1998).

In this case, prospective jurors self-reported their race by so indicating in a space on the printed juror questionnaire. Defendant's first *Batson* objection came when the prosecutor peremptorily challenged prospective juror James Love, an African-American male. In support of this objection, defendant pointed out that Mr. Love had given the same answers to questions concerning the death penalty as white prospective jurors and that the State had already peremptorily challenged another minority prospective juror, Mary Brooks, a Native American female. The trial court noted that the first juror seated was a black juror and that there were no other peremptory challenges against black jurors. The trial court ruled that defendant had not yet made a *prima facie* case and allowed the State's challenge of Mr. Love.

Defendant next objected when prospective juror Diana Locklear was challenged by the prosecutor. Although defendant initially indicated that he did not care to be heard, after the trial court inquired, defendant stated that the prosecutor was using the peremptory challenges "on minorities," mentioning the earlier excusals of Ms. Brooks and Mr. Love, and argued again that white jurors who had answered

questions concerning the death penalty in a similar fashion had been passed. The trial court then ruled:

> [A]t this point . . . [t]here were only two Indian jurors removed peremptorily by the State. One, two, three, four—it appears out of nine jurors, the State has passed, let's see, one, two, three, four Indian jurors. Out of nine selected, four have been Indians.
>
> I do not see that you've made out a prima facie case yet. However, you may continue to renew your motion.

We note that while it appears from the transcript of this particular exchange that both the trial court and defense counsel presumed prospective juror Locklear to be Native American, her self-reported race, indicated on the juror questionnaire, was white.

Jury *voir dire* continued, and the prosecutor exercised another peremptory challenge against an African-American prospective juror, Jimmy Cummings. Defendant again raised a *Batson* objection. The trial court said, "I understand," and confirmed the race reported on the juror's questionnaire. To this point in the jury *voir dire*, forty-seven venire members had been questioned; nine had been seated, including one black, four Native Americans, and four whites. Five blacks had been excused for cause, and Mr. Cummings' excusal made the second peremptory challenge of a black prospective juror by the State. In addition, the State had exercised peremptory challenges against two Native American prospective jurors. While the trial court did not explicitly rule at this point that defendant had failed to make a *prima facie* showing of discrimination so as to require the State to come forward with reasons for the challenge, we believe it is clear from the record that this was the trial court's decision. Defendant having made no other showing to support his *Batson* objection, we cannot say that the trial court erred in allowing the challenge and continuing with jury *voir dire*.

[3] The State's next peremptory challenge was to Lisa Locklear, a Native American female. After defendant's objection, the trial court said, "I understand the objection. We'll deal with all of this later," and excused Ms. Locklear. Through the remainder of the jury selection, the State exercised four more peremptory challenges—against two white jurors, a Native American juror, and a black juror. Defendant did not raise *Batson* objections to any of these challenges. After a jury of twelve and two alternates was seated, with a racial makeup of seven Indian, two black, and five white jurors, the trial court revisited

the "ongoing *Batson* motion of the defendant."

The trial court first considered defendant's contention that Native American prospective jurors had been excused in a racially discriminatory manner. Noting that the State had "passed seven jurors of the Indian race and struck three," the trial court nonetheless found that defendant had made a *prima facie* case of discrimination as to the three challenged Native American jurors: Mary Brooks, Lisa Locklear, and Connie Hester. The State gave the following reasons why these prospective jurors were excused.

> [PROSECUTOR]: As to Hester, family history. As to Lisa Locklear, marijuana conviction and her attitude, smiling and laughing during the time we were asking the questions. As to— I'm not sure what Brooks' first name is. I can't read that. Indian female. She was undecided about the death penalty and wavered when I asked her the questions.

Defendant was given an opportunity to give a rebuttal and responded as follows.

> [DEFENSE COUNSEL]: Your Honor, in rebuttal to that I would point out to the Court that several white jurors indicated that they had been—prior convictions for drugs and for DWIs and other charges and the State passed them. Particularly, I re-member Rodger Britt had DWI and marijuana charges. Some of the other jurors had DWI charges. James Lewis had several DWI charges. And the State passed them despite those prior convictions.

The trial court found that the State had tendered racially neutral explanations. We hold that this was not error.

After carefully reviewing the transcripts of jury *voir dire*, we find that the reasons articulated by the prosecutor are supported by the record. Prospective juror Hester indicated that she had four relatives who were currently or had been in jail or prison. Ms. Locklear admit-ted to pleading guilty to possession of marijuana. Ms. Brooks, after extensive questioning, expressed her opposition to the death penalty but also indicated that she might be able to set aside her beliefs. The State exercised its peremptory challenge of Ms. Brooks after the trial court had twice denied a challenge for cause. A juror's reservations "concerning his or her ability to impose the death penalty constitute a racially neutral basis for exercising a peremptory challenge." *Cummings*, 346 N.C. at 310, 488 S.E.2d at 561.

Defendant's only rebuttal was that the State had passed several white jurors despite drug and DWI convictions, in apparent response to the prosecutor's reasons for excusing Ms. Locklear. We have previously rejected a defendant's attempt to show discriminatory intent by "finding a single factor among the several articulated by the prosecutor . . . and matching it to a passed juror who exhibited that same factor." *Porter*, 326 N.C. at 501, 391 S.E.2d at 152; *see also State v. Kandies*, 342 N.C. 419, 435-36, 467 S.E.2d 67, 75-76, *cert. denied*, ⸺ U.S. ⸺, 136 L. Ed. 2d 167 (1996). In this case, the prosecutor pointed to Ms. Locklear's demeanor as well as her prior drug conviction as the basis for the challenge.

The ultimate burden of persuasion in a *Batson* claim is on the defendant. *Porter*, 326 N.C. at 497-98, 391 S.E.2d at 150. On review, deference is given to the trial court's findings as to the State's given reasons for the challenges. *Hernandez v. New York*, 500 U.S. 352, 365, 114 L. Ed. 2d 395, 409 (1991); *see also State v. Floyd*, 343 N.C. 101, 105, 468 S.E.2d 46, 48, *cert. denied*, ⸺ U.S. ⸺, 136 L. Ed. 2d 170 (1996). Given the prosecutor's articulation of racially neutral reasons for challenging prospective jurors Hester, Locklear, and Brooks, which are supported by the record, and given defendant's inadequate rebuttal, we cannot conclude that the trial court erred in denying defendant's *Batson* claim as to these three jurors.

[4] The trial court then inquired into defendant's *Batson* challenge to the excusal of two black prospective jurors, Mr. Cummings and Mr. Love. The court noted that these prospective jurors were not of the same race as defendant. However, defendant asserted that they were members of a minority race who were asked the same questions, and gave the same responses, as white jurors who were passed by the State. The trial court found that defendant had not made a *prima facie* case as to the exclusion of these two jurors. We hold that this was not error.

As noted above, defendant's standing to assert a *Batson* claim is not impaired by the fact that he is of a different race than the challenged jurors. However, the race of a defendant, as well as the race of the victim and key witnesses, is a relevant circumstance that the trial court may consider when determining whether defendant has raised an inference of purposeful discrimination sufficient to make a *prima facie* case upon a *Batson* motion. *State v. Smith*, 328 N.C. 99, 120, 400 S.E.2d 712, 724 (1991). Furthermore, although the basis for defendant's *Batson* motion was that prospective minority jurors were chal-

lenged while white jurors who gave similar answers were passed, this Court has held that disparate treatment of prospective jurors is not necessarily dispositive of discriminatory intent. *Floyd*, 343 N.C. at 105-06, 468 S.E.2d at 48-49. We conclude that the trial court's finding that defendant failed to make a *prima facie* showing of discrimination as to the State's challenges of Mr. Cummings and Mr. Love was not clearly erroneous.

**[5]** In his brief to this Court, defendant also argues that it was a violation of the Equal Protection Clause for the trial court to consider his *Batson* motion separately as to challenged Native American and African-American prospective jurors and that the trial court erred by placing undue emphasis on the fact that some minority jurors were seated. We reject both contentions.

As previously stated, discriminatory use of peremptory challenges on the basis of race is forbidden regardless of the respective races of the defendant and of the challenged jurors. *See Powers v. Ohio*, 499 U.S. 400, 113 L. Ed. 2d 411; *cf. Georgia v. McCollum*, 505 U.S. 42, 120 L. Ed. 2d 33 (1992) (holding that racially discriminatory use of peremptory challenges by a criminal defendant is also prohibited). However, we note that "[r]acial identity between the defendant and the excused person might in some cases be the explanation for the prosecution's adoption of the forbidden stereotype," *Powers*, 499 U.S. at 416, 113 L. Ed. 2d at 429, and racial identity between defendant and some of the challenged jurors in this case was a legitimate factor for the trial court to consider in ruling on defendant's *Batson* motion. Likewise, the fact that defendant and the challenged black jurors were of different races was a relevant circumstance which the trial court was entitled to weigh. We therefore cannot conclude that the trial court erred in considering defendant's *Batson* challenges separately.

Finally, while the excusal of even a single juror for a racially discriminatory reason is impermissible, *see State v. Robbins*, 319 N.C. 465, 491, 356 S.E.2d 279, 295, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987), the trial court may consider the acceptance rate of minority jurors by the State as evidence bearing on alleged discriminatory intent, *Smith*, 328N.C. at 121, 400 S.E.2d at 724. We reject defendant's contention that the trial court unduly emphasized this factor. For the foregoing reasons, we conclude that there was no violation of defendant's right, under either the state or federal Constitution, to a jury selected in a racially nondiscriminatory manner.

[6] Defendant next contends that the trial court improperly limited *voir dire* of several prospective jurors in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 18 and 19 of the North Carolina Constitution. It is well established that while counsel are allowed wide latitude in examining jurors on *voir dire*, the extent and manner of the inquiry rests within the trial court's discretion. *State v. Parks*, 324 N.C. 420, 423, 378 S.E.2d 785, 787 (1989). The trial court's decisions regarding the extent and manner of *voir dire* questioning will not be disturbed absent an abuse of discretion. *State v. Jaynes*, 342 N.C. 249, 266, 464 S.E.2d 448, 459 (1995), *cert. denied*, 518 U.S. 1024, 135 L. Ed. 2d 1080 (1996).

Defendant argues that he was prevented from questioning prospective jurors concerning the credibility of law enforcement officers and the weight jurors would give their testimony. However, the record reveals that the trial court gave defendant ample opportunity to inquire into jurors' potential bias in favor of law enforcement. The court sustained objections to hypothetical or confusing questions, but allowed defense counsel opportunity to rephrase the questions. We find no abuse of discretion on the part of the trial court.

[7] Defendant also argues that the trial court limited *voir dire* concerning whether jurors would automatically vote for the death penalty, in violation of *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492 (1992). Again, a careful examination of the transcript does not bear out defendant's contention. Defendant was permitted to pursue this line of inquiry, albeit with direction from the trial court to rephrase certain questions. We find no abuse of the trial court's discretion on this point. Defendant also argues that the trial court committed error by limiting *voir dire* on prospective jurors' ability to consider mitigating evidence and to follow the court's instructions. These contentions are without merit. There is no indication that the trial court abused its discretion during jury *voir dire*, and defendant shows no prejudice from any alleged improper ruling.

[8] Finally, defendant argues that the trial court improperly allowed the prosecutor's for-cause challenges to excuse certain prospective jurors based on their responses to questions concerning capital punishment. Whether a prospective juror may be excused for cause because of his or her views on capital punishment depends upon whether those views will "prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841,

**STATE v. LOCKLEAR**

[349 N.C. 118 (1998)]

851-52 (1985); *see also State v. Flippen*, 344 N.C. 689, 697, 477 S.E.2d 158, 163 (1996). Prospective jurors may also be properly excused for cause if they are unable to " 'state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.' " *State v. Brogden*, 334 N.C. 39, 43, 430 S.E.2d 905, 908 (1993) (quoting *Lockhart v. McCree*, 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149-50 (1986)). We have consistently accorded deference to a trial court's judgment concerning a prospective juror's ability to impartially follow the law. *See, e.g., id.*

Defendant does not identify any specific contention of error as to a particular juror. However, of the thirty-one jurors listed by defendant as improperly excused for cause, two were in fact peremptorily challenged, and another was excused for cause with the approval of defendant. A careful examination of the record reveals that none of the remaining twenty-eight was able to state clearly that he or she could set aside personal opposition to the death penalty and render a verdict in accordance with the law and the evidence in the case. Accordingly, we reject this assignment of error.

**[9]** Defendant also contends that the trial court improperly overruled defendant's challenge for cause of a prospective juror based on the juror's inability to be impartial in weighing the credibility of law enforcement officers. The record reveals that the venire member in question was in fact ultimately dismissed for cause; thus, this contention is without merit.

**[10]** By his next four assignments of error, defendant alleges that the trial judge improperly and prejudicially conveyed an opinion by his conduct and participation in the *voir dire* of prospective jurors, by his examination of witnesses, by his nonverbal conduct, and by his comments on the evidence and witnesses. These allegations are not supported by the record.

It is indisputable that every person charged with a crime is "entitled to a trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm." *State v. Carter*, 233 N.C. 581, 583, 65 S.E.2d 9, 10 (1951). The relevant statute directs that a "judge may not express during any stage of the trial, any opinion *in the presence of the jury* on any question of fact to be decided by the jury." N.C.G.S. § 15A-1222 (1997) (emphasis added).

The bare possibility, however, that an accused may have suffered prejudice from the conduct or language of the judge is not

sufficient to overthrow an adverse verdict. The criterion for determining whether or not the trial judge deprived an accused of his right to a fair trial by improper comments or remarks in the hearing of the jury is the probable effect of the language upon the jury. In applying this test, the utterance of the judge is to be considered in the light of the circumstances under which it was made.

*Carter*, 233 N.C. at 583, 65 S.E.2d at 10-11 (citations omitted).

Defendant contends that the judge cast aspersions on defense counsel during jury *voir dire* which diminished the effectiveness of the defense in the eyes of the jury. However, we find nothing in those portions of the record to which defendant points that suggests the trial judge's comments or questions improperly influenced jurors or disparaged defense counsel. Furthermore, because prospective jurors were examined individually, no possible prejudicial impact on the jury could have occurred as a result of the judge's remarks to defense counsel during the questioning of persons who were ultimately excused.

[11] Defendant also contends that the court's participation in the trial, by questioning and by conduct, was improper. Defendant points first to an exchange between the trial court and defense counsel concerning the relevance of a line of questioning being pursued by defendant. The trial court was unwilling to allow defendant to question a witness about the possible existence of guns in the shed located near the shooting when there was no record evidence that defendant in fact knew that the victim kept weapons in the shed and no proffered evidence of self-defense. The scope and manner of examination of witnesses are matters ordinarily governed by the trial judge, who may take appropriate measures to restrict improper questioning by counsel. *State v. Searles*, 304 N.C. 149, 157, 282 S.E.2d 430, 435 (1981). The trial judge in this instance conducted a proper inquiry into the relevance of defendant's line of questioning so as to prevent inadmissable evidence from being presented to the jury. Furthermore, the exchange took place outside the presence of the jury, the judge having sent the jurors from the courtroom prior to initiating the relevance inquiry. There was no error and no prejudicial effect on the jury.

[12] Next, defendant points to the following remarks, made during the examination of defendant's mother, Mrs. Taylor:

Q. BY [DEFENSE COUNSEL]: What, if anything, happened to the weapon that you found in the shed?

[PROSECUTOR]: Object.

THE COURT: Sustained, without a foundation. Is it relevant anyway what happened to it, if there was a weapon? If anything— I don't know whether anything happened to it at this point.

While a judge may never express an opinion upon the credibility of evidence or the merits of a case, *State v. Lynch*, 279 N.C. 1, 11, 181 S.E.2d 561, 567 (1971), in this situation, the trial court was merely remarking on the relevancy of the evidence. We cannot say that this query by the judge had the probable effect of improperly influencing the jury and thereby denying defendant his right to a fair trial.

**[13]** Defendant points to instances during the sentencing phase where the judge allegedly commented on evidence, conducted an examination of a witness, and attempted to present evidence of an aggravating circumstance. In the first instance, the record shows that the trial court, outside the presence of the jury, acted upon *defendant's* objection to the State's attempt to offer a certified copy of defendant's criminal record rather than the judgment of a prior conviction. Defendant does not explain, and we fail to see, how this constitutes an improper comment on the evidence.

As to the second instance, the prosecutor was examining the officer who investigated the assault for which defendant had previously been convicted. The following testimony was elicited:

Q. Did you have an occasion to investigate an assault on a Donnie Wilkins?

A. Yes, sir, I did.

. . . .

Q. Is Donnie Wilkins an individual that's confined to a wheelchair?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled. Go ahead.

THE WITNESS: Yes, sir, he was.

THE COURT: Do you mean at the time of the assault or some later time, Solicitor?

[PROSECUTOR]: No, sir. At the time of the assault, Your Honor.

THE COURT: All right.

We have held that a trial judge "may question a witness for the purpose of clarifying his testimony and promoting a better understanding of it." *State v. Whittington*, 318 N.C. 114, 125, 347 S.E.2d 403, 409 (1986); *see also State v. Jackson*, 306 N.C. 642, 651, 295 S.E.2d 383, 388 (1982). In this case, the judge did no more than interpose a clarifying question. We find no objectionable intimation of opinion as to the witness' credibility, defendant's culpability, or any factual controversy to be decided by the jury. *See State v. Ramey*, 318 N.C. 457, 465, 349 S.E.2d 566, 571 (1986). Therefore, we reject this contention.

[14] Finally, defendant contends that the trial court "assisted and coaxed the prosecutor in presenting evidence, making objections to questions by the defense, and sustaining its own objections," and belittled defense counsel. Defendant points to an instance during the examination of defendant's uncle, R.D. Locklear, when the trial court inquired, "Well, now—is there an objection to all that?" When the prosecutor answered affirmatively, the trial court sustained the objection. Later, during cross-examination of this witness, the trial court asked whether defendant wished to continue his objection to a line of questioning. When defense counsel answered, "Your Honor, you overruled it," the judge answered, "Yeah, but we're getting into something else now. Do you object now?" Defendant did not object. These inquiries, made to attorneys for both sides as to their desire to object to potentially inadmissible testimony, do not constitute "coaxing the prosecutor in presenting evidence" or "making objections to questions by the defense." Neither do they indicate that the court was rude to or belittled defense counsel.

In sum, defendant has failed to show that any impermissible expression of opinion was made by the trial judge in the presence of the jury or that any conduct or statement by the judge improperly influenced the jury or prejudiced defendant in any manner. Accordingly, these assignments of error are rejected.

Based on six assignments of error, defendant's next argument concerns evidentiary rulings made by the trial court. Defendant asserts that the court committed reversible error by admitting, over his objection, evidence that was inadmissible, thereby violating his state and federal constitutional rights to due process of law, to a trial by an impartial jury, and to be free from cruel and unusual punishment.

**[15]** Defendant first contends that the trial court erred by allowing into evidence certain opinion testimony of Dr. Marvin Thompson, a medical expert in the field of forensic pathology, and SBI Agent Al Langley, an expert in firearms. Defendant stipulated to the qualification of both witnesses as experts. Langley conducted tests with the murder weapon to determine muzzle-to-target distances based on shotgun-pellet patterns. He testified in detail, without objection, about how these tests were conducted. The exhibits of the test results and his written report were then received into evidence, over defendant's objections. Defendant contends that the tests were inadmissible and prejudicial because the experiments were not conducted under circumstances sufficiently similar to the conditions at the time of the crime.

Experimental evidence is competent and admissible if the experiment is carried out under substantially similar circumstances to those which surrounded the original occurrence. *State v. Jones*, 287 N.C. 84, 97, 214 S.E.2d 24, 33 (1975); *State v. Carter*, 282 N.C. 297, 300, 192 S.E.2d 279, 281 (1972). The absence of exact similarity of conditions does not require exclusion of the evidence, but rather goes to its weight with the jury. *Id.* The trial court is generally afforded broad discretion in determining whether sufficient similarity of conditions has been shown. *State v. Bondurant*, 309 N.C. 674, 686, 309 S.E.2d 170, 178 (1983).

Agent Langley used the same twelve-gauge shotgun that fired the fatal shots and used ammunition consistent with that recovered at the scene of the shooting to re-create conditions similar to those that existed at the time of the murder. The purpose of the tests was to determine, based on the diameter of the shotgun-pellet pattern, the distance at which the gun was fired. Agent Langley was well qualified by his knowledge, training, and experience to conduct these tests and render an expert opinion as to the results. The trial court did not err in admitting this evidence.

**[16]** Likewise, we find no error in the admission of Dr. Thompson's opinions. "It is undisputed that expert testimony is properly admissible when such testimony can assist the jury to draw certain inferences from facts because the expert is better qualified." *State v. Bullard*, 312 N.C. 129, 139, 322 S.E.2d 370, 376 (1984); *see* N.C.G.S. § 8C-1, Rule 702(a) (Supp. 1997). Dr. Thompson testified that the shot pattern that corresponded with firing the shotgun from the three-foot range most closely matched the wound in the victim's back. He also

rendered his expert medical opinion as to the effect on the body such a shot would have produced. Dr. Thompson performed the autopsy on the victim, examined and measured the wounds, and reviewed and measured the shotgun-pellet test patterns, allowing him to form an opinion as to which shot pattern most closely matched the gunshot wound in the victim's back. By giving his opinion based on his experience as a pathologist and his personal observation of the gunshot wounds, Dr. Thompson was undoubtedly in a position to assist the jury in determining the distance from which the fatal shots were fired. Dr. Thompson's testimony illustrating the effect such a shot would have had on the human body was likewise appropriate to assist the jury in understanding the evidence. The trial court did not err in overruling defendant's objection to this testimony.

[17] Defendant also objected to Dr. Thompson's testifying that the victim's blood-alcohol level, the equivalent of .02 on a Breathalyzer test, would have been the result of the ingestion of approximately one-half of a beer. Dr. Thompson personally drew the blood sample from the victim during the autopsy and incorporated the results of the blood-alcohol test into the autopsy report. Dr. Thompson measured the victim's height and weight and noted that there was "a small amount of partially digested food" in the victim's stomach. Based on his training, knowledge, and experience as a pathologist, Dr. Thompson gave his opinion, to a reasonable medical certainty, of the amount of alcohol that was absorbed into the victim's bloodstream. Defendant points to no basis for his assertion that Dr. Thompson, as a medical expert, was unqualified to draw this conclusion. The assignment of error based on Dr. Thompson's testimony is rejected.

[18] Defendant next contends that the trial court committed reversible error by admitting the prior statement of defendant's uncle, James B. Locklear, Jr., given to police on the night of the shooting. At trial, the sole basis of defendant's objection to the prior statement's admission into evidence was that Locklear had not been impeached. On appeal, defendant now contends that the prior statement was inadmissible as corroborative evidence because it was inconsistent with Locklear's testimony at trial. We find no error.

After carefully examining both the testimony and the prior statement of James B. Locklear, Jr., we conclude that the prior statement was properly admitted as corroborative evidence. Locklear's prior statement was consistent with his testimony at trial and contained no significant additional facts. *See Ramey*, 318 N.C. at 469, 349 S.E.2d at

573; *State v. Riddle*, 316 N.C. 152, 156, 340 S.E.2d 75, 77 (1986). Furthermore, we note that the trial court gave proper limiting instructions, directing the jury to consider the evidence only for the purpose of corroboration.

**[19]** Defendant also objected to an allegedly hearsay statement made by James B. Locklear, Jr., concerning the circumstances under which Locklear had come to live in the victim's home. During direct examination of the witness by the State, the following occurred:

Q. How is it you came to live there?

A. Me and my wife were separated, so I moved in with them.

Q. Did Mr. Taylor give his blessings to that?

[DEFENSE COUNSEL]: Objection.

THE WITNESS: Yes, sir.

It does not appear from the transcript that the trial court ruled on defendant's objection; nonetheless, the challenged testimony came in.

It is well settled that " '[t]he erroneous admission of hearsay, like the erroneous admission of other evidence, is not always so prejudicial as to require a new trial.' " *State v. Abraham*, 338 N.C. 315, 356, 451 S.E.2d 131, 153 (1994) (quoting *Ramey*, 318 N.C. at 470, 349 S.E.2d at 574). Defendant has the burden of showing error and that there was a reasonable possibility that a different result would have been reached at trial if such error had not occurred. N.C.G.S. § 15A-1443(a) (1997); *see also State v. Sills*, 311 N.C. 370, 378, 317 S.E.2d 379, 384 (1984).

Assuming, *arguendo*, that James Locklear's answer constituted inadmissible hearsay, we are not convinced that there is a reasonable possibility that a different result would have been reached at trial had this statement not been admitted. Thus, we find no prejudicial error.

**[20]** Defendant next argues, by three assignments of error, that numerous evidentiary rulings of the trial court denied him the right to present a defense. "The right of a defendant charged with a criminal offense to present to the jury his version of the facts is a fundamental element of due process of law, guaranteed by the Sixth and Fourteenth Amendments to the federal Constitution and by Article I, Sections 19 and 23 of the North Carolina Constitution." *State v. Miller*, 344 N.C. 658, 673, 477 S.E.2d 915, 924 (1996). However, in this

case, the record demonstrates no error in any ruling of the trial court cited by defendant.

Initially, we note no instance where the trial court erred or abused its discretion by excluding relevant, admissible evidence. With respect to instances of alleged erroneous exclusion of evidence, the record fails to show what the answer would have been had the witnesses been permitted to respond.

> "It is well established that an exception to the exclusion of evidence cannot be sustained where the record fails to show what the witness' testimony would have been had he been permitted to testify." "[I]n order for a party to preserve for appellate review the exclusion of evidence, the significance of the excluded evidence must be made to appear in the record and a specific offer of proof is required unless the significance of the evidence is obvious from the record."

*State v. Johnson*, 340 N.C. 32, 49, 455 S.E.2d 644, 653 (1995) (quoting *State v. Simpson*, 314 N.C. 359, 370, 334 S.E.2d 53, 60 (1985)) (citations omitted); *see* N.C.G.S. § 8C-1, Rule 103 (1992). By failing to preserve evidence for review, defendant deprives the Court of the necessary record from which to ascertain if the alleged error is prejudicial. *State v. Miller*, 321 N.C. 445, 452, 364 S.E.2d 387, 391 (1988). Thus, in no instance where defendant alleges error based on the improper exclusion of evidence can he show that the ruling was prejudicial.

[21] By his next assignment of error, defendant argues that the trial court committed reversible error by permitting the jury to take evidence into the jury room without defendant's consent and without allowing defendant the opportunity to object. The controlling statute is N.C.G.S. § 15A-1233, which provides that, upon a request by the jury to review evidence, the trial court must conduct all jurors into the courtroom and must exercise its discretion in determining whether to permit the requested evidence to be read to or examined by the jury. N.C.G.S. § 15A-1233(a) (1997); *State v. Ashe*, 314 N.C. 28, 331 S.E.2d 652 (1985). Additionally, "[u]pon request by the jury and with consent of all parties," the trial court may, in its discretion, "permit the jury to take to the jury room exhibits and writings which have been received in evidence." N.C.G.S. § 15A-1233(b).

During its deliberations in the guilt phase of the trial, the jury sent a note to the trial judge requesting to review two items: the tes-

timony of defendant's uncle, James B. Locklear, Jr., and defendant's statement to police. The trial court, in accordance with the statutory requirement, summoned the jurors into the courtroom. As to the request to "review the testimony of James B. Locklear," the trial court ruled: "In my discretion, that is denied. It is the duty of the jurors to remember the testimony as it was given here in the courtroom." The trial court properly exercised its discretion on this point in conformance with the statute and applicable case law.

[22] Next, the trial court granted the jury's request to take defendant's statement, State's Exhibit 28, into the jury room. While defendant claims as error that he was not given the opportunity to object to the submission of the exhibit to the jury, the record reveals no action by the trial court which prevented defendant from making such an objection or otherwise indicating his lack of consent. However, N.C.G.S. § 15A-1233(b) requires the consent of all parties, and while defendant did not object, neither did he give his consent. Assuming that this was error, however, we conclude it was harmless in this instance. *See State v. Cunningham*, 344 N.C. 341, 364, 474 S.E.2d 772, 783 (1996); *see also State v. Wagner*, 343 N.C. 250, 257-58, 470 S.E.2d 33, 37-38 (1996) (no prejudicial error where excerpt of defendant's statement was submitted for jury examination over defendant's objection); *State v. Cannon*, 341 N.C. 79, 83-86, 459 S.E.2d 238, 241-43 (1995) (no prejudicial error where crime-scene and autopsy photographs, defendant's confession, a witness' statement, and a diagram were taken into jury room over defendant's objection). Defendant makes no persuasive assertion of prejudice. His statement had previously been admitted into evidence; read to the jury in its entirety during the testimony of Detective Randal Patterson; and published, individually, to jurors as the State's rebuttal evidence. Under these circumstances, and in light of the totality of the evidence against defendant, we conclude that allowing the jury to take this exhibit into the jury room could not have affected the outcome of the trial. Thus, there was no prejudicial error.

[23] By his next eight assignments of error, defendant argues that the prosecutor was allowed to make improper, inflammatory, and prejudicial arguments during closing arguments of the guilt phase of the trial. This Court has firmly established that:

> Trial counsel are granted wide latitude in the scope of jury argument, and control of closing arguments is in the discretion of the trial court. Further, for an inappropriate prosecutorial com-

ment to justify a new trial, it "must be sufficiently grave that it is prejudicial error."

*State v. Soyars*, 332 N.C. 47, 60, 418 S.E.2d 480, 487-88 (1992) (quoting *State v. Britt*, 291 N.C. 528, 537, 231 S.E.2d 644, 651 (1977)) (citations omitted). Applying these principles to the instant case, we find no error.

In the instant case, the prosecutor argued to the jury that the twelve-gauge shotgun had "to be loaded, breech closed, fired, unloaded." Defendant objected on the basis that there was no evidence to support this argument. The trial court ruled that the prosecutor was holding the weapon and "may argue from the weapon." The shotgun had been introduced as evidence, and the mechanics of loading and firing it were based directly upon evidence in the case. The prosecutor also argued that the very act of loading and firing the weapon showed premeditation and deliberation. As this was a reasonable inference to be drawn from the evidence, this ruling was not improper.

[24] Defendant also objected to the prosecutor's assertion that "defendant is here because of choices that he made" and his exhortation to the jury not to "let [the defense] put that fault or blame on you as jurors." These remarks fall well within the wide latitude allowed for forceful persuasion and are not improper or inflammatory. Therefore, we find no error in the trial court's ruling allowing these arguments.

[25] Next, defendant challenged the following arguments:

And heat of passion? There was no heat of passion involved in this. You won't hear any instruction from the [c]ourt on heat of passion.

. . . .

You won't hear any instruction from the [c]ourt on self-defense, because there is no evidence to support it, ladies and gentlemen. Simply does not exist.

Defendant contends that these remarks, in addition to being improper and prejudicial, were misstatements of the law.

The record shows that the trial court gave instructions on first-degree and second-degree murder only, not manslaughter or "heat of passion." The prosecutor's assertion that the jury would not hear

instructions on heat of passion was correct, not a misstatement of the law. Likewise, there was no instruction on self-defense. The prosecutor's attempt to convince the jury that there was no evidentiary support for heat of passion or self-defense was permissible within the "wide latitude [granted to counsel] in the argument of hotly contested cases." *State v. Fullwood*, 343 N.C. 725, 740, 472 S.E.2d 883, 891 (1996), *cert. denied*, ___ U.S. ___, 137 L. Ed. 2d 339 (1997). The prosecutor did not misstate the law, distort the evidence, or inflame or prejudice the jury; thus, the trial court did not err in allowing these arguments.

**[26]** The prosecutor also told the jury: "You're the voice of this community. You're here representing the community in which we all live." Defendant objected and was overruled. We have previously upheld virtually identical jury arguments. *See, e.g.*, *State v. Bishop*, 346 N.C. 365, 396, 488 S.E.2d 769, 786 (1997). This assignment of error is rejected.

As to the final line of argument to which defendant points as improper, the trial court in fact sustained defendant's objections at trial and gave the jury a curative instruction. Upon an examination of the record, we do not find that the trial court acted improperly or that defendant was prejudiced. For all of the foregoing reasons, we hold that there was no error in the trial court's rulings made during the prosecutor's closing arguments in the guilt phase of the trial.

**[27]** Defendant next assigns as error the trial court's failure to grant defendant's request for a jury instruction on voluntary manslaughter when the evidence supported such an instruction. Before the trial court, defendant argued that the evidence supported an instruction on voluntary manslaughter based upon the victim's provocation arousing the "heat of passion" in defendant. The State contended that nothing in the evidence suggested defendant was temporarily incapable of reflection or otherwise supported the proposed instruction. After hearing both sides, the trial court determined that the jury charge would be limited to first-degree murder, second-degree murder, and not guilty.

Defendant contends that the court's refusal to instruct the jury on voluntary manslaughter violated his rights under the state and federal Constitutions. We disagree. This Court has consistently held that "when a jury is properly instructed on both first-degree and second-degree murder and returns a verdict of guilty of first-degree murder, the failure to instruct on voluntary manslaughter is harmless error."

*State v. East*, 345 N.C. 535, 553, 481 S.E.2d 652, 664, *cert. denied*, ——
U.S. ——, 139 L. Ed. 2d 236 (1997); *see also State v. Exxum*, 338 N.C.
297, 300, 449 S.E.2d 554, 556 (1994); *State v. Wiggins*, 334 N.C. 18, 37,
431 S.E.2d 755, 766 (1993). Assuming, *arguendo*, that the evidence
warranted an instruction on voluntary manslaughter, the jury's ver-
dict of first-degree murder and its rejection of second-degree murder,
upon proper instructions, renders any error harmless.

**[28]** By another assignment of error, defendant argues that the trial
court committed reversible error by refusing to give an instruction on
self-defense. Defendant contends the evidence showed the following:
that the victim was the aggressor; that defendant and the victim
fought; that defendant bested the victim in the fight; that the victim
then told defendant to wait, he would be right back; and that the vic-
tim then moved toward the shed, where he kept weapons. Defendant
asserts this was sufficient evidence for the jury to infer that defend-
ant was in reasonable apprehension of death or great bodily harm.

We summarized the applicable law in *State v. Ross*, 338 N.C. 280,
449 S.E.2d 556:

> There are two types of self-defense: perfect and imperfect.
> Perfect self-defense excuses a killing altogether, while imperfect
> self-defense may reduce a charge of murder to voluntary
> manslaughter. For defendant to be entitled to an instruction on
> either perfect or imperfect self-defense, the evidence must show
> that defendant believed it to be necessary to kill his adversary in
> order to save himself from death or great bodily harm. In addi-
> tion, defendant's belief must be "reasonable in that the circum-
> stances as they appeared to him at the time were sufficient to
> create such a belief in the mind of a person of ordinary firmness."

*Id.* at 283, 449 S.E.2d at 559-60 (citations omitted) (quoting *State v.
McKoy*, 332 N.C. 639, 644, 422 S.E.2d 713, 716 (1992)). Applying these
principles to this case, we conclude that the trial court did not err in
refusing to give a jury instruction on self-defense.

In *Ross*, which occurred under similar circumstances, we held
that the evidence was insufficient to merit an instruction on either
perfect or imperfect self-defense, and we reach the same conclusion
here. In both cases, the defendant's own statement acknowledged
that the victim was unarmed when the defendant shot him in the
back. *Id.*; *see also Exxum*, 338 N.C. 297, 449 S.E.2d 554 (holding that
defendant was not entitled to an instruction on imperfect self-defense

**STATE v. LOCKLEAR**

[349 N.C. 118 (1998)]

where undisputed evidence showed that defendant shot victim in the back as victim was walking away from defendant). Likewise, in *Ross*, as here, the "[d]efendant failed to present evidence to support a finding that he in fact formed a belief that it was necessary to kill the victim in order to protect himself from death or great bodily harm." *Ross*, 338 N.C. at 283, 449 S.E.2d at 560. Defendant offered no evidence that at the time of the shooting he believed, reasonably or unreasonably, that it was necessary to kill the victim in order to protect himself from imminent death or great bodily harm. Accordingly, the trial judge did not err by failing to instruct on self-defense.

[29] By three assignments of error, defendant next argues that the trial court committed reversible error at the beginning of the capital sentencing proceeding by allowing the prosecutor to put before the jury a certified copy of his criminal record and then substitute for that exhibit another exhibit without retaining the original exhibit as part of the trial record. We find no merit in this argument.

The State offered "a certified copy of defendant's record" as the method of proof of the sole aggravating circumstance that defendant had previously been convicted of a felony involving the use of violence to the person. Defendant objected, and the trial court excused the jury from the courtroom. After hearing arguments, the judge determined that use of defendant's criminal record, which included both charges and convictions, was not provided for by case law, and he required proof of the prior felony conviction by introduction of the judgment itself. The trial court allowed the prosecutor to withdraw the copy of defendant's criminal record and substitute the judgment as State's Exhibit S-1. The testimony of the deputy clerk of superior court laid the foundation for admission of the judgment into evidence.

Although a different form of proof may be accepted, so long as it is sufficiently reliable, this Court has recognized that the preferred method of proving a prior conviction is introduction of the judgment itself into evidence. *See State v. Bishop*, 343 N.C. 518, 551, 472 S.E.2d 842, 859-60 (1996), *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 723 (1997); *State v. Thomas*, 331 N.C. 671, 679, 417 S.E.2d 473, 479 (1992); *State v. Maynard*, 311 N.C. 1, 26, 316 S.E.2d 197, 211, *cert. denied*, 469 U.S. 963, 83 L. Ed. 2d 299 (1984). While the prosecutor initially proffered a copy of defendant's criminal record, it was never admitted into evidence or "put before the jury." The trial court in this case ruled appropriately in requiring the State to prove the sole aggravating circum-

stance by the preferred method, introduction of the judgment itself. Defendant contends that the mere proffer of his criminal record insinuated to the jury that defendant had an extensive criminal history. However, defendant's bare assertion of prejudice is unsupported by the record. The trial court did not err in admitting the judgment of defendant's prior felony conviction of assault with a deadly weapon inflicting serious injury as proof of the aggravating circumstance.

**[30]** By his next assignment of error, defendant contends that the trial court erred in overruling defendant's objections to improper cross-examination of defendant's expert witnesses. Defendant argues that the prosecutor asked improper questions, not in good faith, that were intended to prejudice the jury. Without identifying how any specific question exceeded the permissible scope of cross-examination, defendant merely refers to several portions of the transcript and generally labels the prosecutor's cross-examination as abusive and insulting to defendant's expert witnesses.

The trial court exercises broad discretion over the scope of cross-examination and, in a sentencing proceeding, is not limited by the Rules of Evidence. *State v. Warren,* 347 N.C. 309, 317, 492 S.E.2d 609, 613 (1997), *cert. denied,* —— U.S. ——, 140 L. Ed. 2d 818 (1998). Generally, the scope of permissible cross-examination is limited only by the discretion of the trial court and the requirement of good faith. *See State v. Scott,* 343 N.C. 313, 339-40, 471 S.E.2d 605, 621 (1996).

During the sentencing proceeding, defendant objected to several questions placed to Dr. Brent Dennis, a professional social worker who testified for defendant. Defendant now asserts broadly that these questions were not asked in good faith and were intended to unduly prejudice the jury. A careful inspection of the record, however, reveals no prejudicial error during the cross-examination of Dr. Dennis. First, the trial court sustained defendant's objection to a question about whether defendant's past would be a predictor of his future actions. The witness did not answer, and defendant suffered no prejudice. Next, three questions concerning the circumstances of defendant's prior assault conviction, which defendant now attempts to challenge on appeal, were not objected to at trial. Applying the plain error rule, we conclude that the trial court did not err by failing to intervene *ex mero motu* to limit this questioning. *See id.* at 339, 471 S.E.2d at 621. Finally, the prosecutor's remaining inquiries concerned whether defendant's background would change, how long defendant had been in prison for his prior conviction, and how much the wit-

ness was compensated for his services. These questions were within the scope of permissible cross-examination. The trial court did not abuse its discretion in overruling defendant's objections.

[31] Defendant also argues that the cross-examination of Dr. John Warren, a forensic psychologist called by defendant to testify as an expert, was abusive, insulting, and degrading, and was intended to distort his testimony. We disagree. Dr. Warren was interrogated as to the amount and method of computation of his fee. We have held that the compensation of an expert witness is a legitimate subject of cross-examination to test the partiality of the witness. *State v. Brown*, 335 N.C. 477, 493, 439 S.E.2d 589, 598-99 (1994). Defendant also points to portions of the transcript where the trial court overruled his objections to questions concerning how Dr. Warren arrived in Robeson County for the trial, the number of capital trials at which Dr. Warren had previously testified, and what Dr. Warren did while administering the MMPI-2 (The Minnesota Multiphasic Personality Inventory-2) to defendant. Nothing in the record suggests abusive or improper interrogation by the prosecutor. Because we find no untoward or bad-faith questioning of Dr. Warren or Dr. Dennis, and no abuse of discretion by the trial court, we reject this assignment of error.

[32] Defendant next argues that the trial court allowed the admission of irrelevant, improper, and prejudicial evidence during the testimony of Detective Ken Sealey in violation of his rights under the state and federal Constitutions. During direct examination of this witness, the prosecutor elicited the following information, to which defendant objected: (1) that the victim of defendant's prior assault conviction had been confined to a wheelchair at the time of the assault, and (2) that the original charge against defendant had been assault with a deadly weapon with intent to kill inflicting serious injury. We have previously held that "evidence of the circumstances of prior crimes is admissible to aid the sentencer" and that "the State is entitled to present witnesses in the penalty phase of the trial to prove the circumstances of prior convictions and is not limited to the introduction of evidence of the record of conviction." *State v. Roper*, 328 N.C. 337, 364-65, 402 S.E.2d 600, 616, *cert. denied*, 502 U.S. 902, 116 L. Ed. 2d 232 (1991). The testimony of Detective Sealey simply conveyed the circumstances of defendant's prior conviction, which had already been introduced as evidence. The record reveals no prejudicial insinuations flowing from this testimony as defendant contends. Accordingly, we hold that the trial court properly exercised its

STATE v. LOCKLEAR

[349 N.C. 118 (1998)]

discretion by allowing this evidence during the penalty phase of the trial and that defendant's constitutional rights were in no way infringed thereby.

**[33]** Defendant next argues that the trial court, during the sentencing phase, excluded relevant mitigating evidence from consideration by the jury. Defendant contends that the trial court's rulings prevented the jury from making an appropriate individualized decision on sentencing, resulting in a violation of defendant's rights under the state and federal Constitutions.

The United States Supreme Court, in *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973 (1978), held that under the Eighth and Fourteenth Amendments to the United States Constitution, the sentencer in capital cases may "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604, 57 L. Ed. 2d at 990. Consistent with this constitutional mandate, our capital punishment statute provides that, during the sentencing phase, evidence may be presented "as to any matter that the court deems relevant to sentence," including matters relating to mitigating circumstances. N.C.G.S. § 15A-2000(a)(3) (1997). The admissibility of mitigating evidence during the penalty phase is not constrained by the Rules of Evidence. *See* N.C.G.S. § 8C-1, Rule 1101(b)(3) (1992); *Green v. Georgia*, 442 U.S. 95, 60 L. Ed. 2d 738 (1979). However, the trial judge must determine the admissibility of such evidence subject to general rules excluding evidence that is repetitive, unreliable, or lacking an adequate foundation. *See State v. Simpson*, 341 N.C. 316, 350, 462 S.E.2d 191, 211 (1995), *cert. denied*, 516 U.S. 1161, 134 L. Ed. 2d 194 (1996).

During the sentencing proceeding, defendant presented significant evidence in mitigation by way of seven witnesses. On numerous occasions, however, the trial court excluded evidence upon the prosecutor's objection, and defendant points to over forty instances where the trial court allegedly excluded admissible mitigating evidence. After conducting an exhaustive examination of each allegedly erroneous ruling, we conclude that the trial court did not commit prejudicial error or abuse its discretion by excluding mitigating evidence proffered by defendant.

However, one of defendant's arguments warrants further discussion. Defendant sought to attack the character of the victim of his

prior assault conviction, Donnie Wilkins, by attempting to introduce Wilkins' criminal record and elicit testimony as to his reputation for violence. Defendant claims that this evidence was relevant to minimize or rebut the State's use of defendant's prior felony conviction as an aggravating circumstance. *See Bishop*, 343 N.C. at 551, 472 S.E.2d at 860. We disagree. The State proved the existence of the aggravating circumstance by submitting the judgment, on the foundation of testimony from the clerk of court, and by the testimony of the investigating officer. Wilkins did not appear at defendant's trial, nor was he a hearsay declarant subject to impeachment as defendant contends. The evidence defendant sought to submit did not serve to illustrate the circumstances of defendant's prior felony conviction, nor did it serve to leave with the jury "a more favorable impression of defendant's character." *State v. Green*, 321 N.C. 594, 611, 365 S.E.2d 587, 597, *cert. denied*, 488 U.S. 900, 102 L. Ed. 2d 235 (1988). Nothing in the criminal record of Donnie Wilkins sheds light on defendant's age, character, education, environment, habits, mentality, propensities, or criminal record, or on the circumstances of the offense for which defendant was being sentenced. Accordingly, the evidence was not relevant to mitigation, and the trial court did not err in excluding it.

Defendant's next five arguments concern the trial court's alleged failure to submit and properly instruct on several statutory and nonstatutory mitigating circumstances. For the following reasons, we find these arguments to be without merit.

[34] Defendant first asserts that the trial court committed reversible error by refusing to submit, upon defendant's written request, the statutory mitigating circumstance that the victim was a voluntary participant in defendant's homicidal conduct, pursuant to N.C.G.S. § 15A-2000(f)(3). Defendant argues that this mitigating circumstance was appropriate because the victim provoked a fight with defendant and, therefore, was a voluntary participant in the homicidal conduct that followed. We do not agree.

This Court recently examined this mitigating circumstance for the first time in *State v. Larry*, 345 N.C. 497, 481 S.E.2d 907, *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 234 (1997). In that case, we concluded that the evidence did not support submission of the mitigating circumstance where the victim attempted to apprehend the defendant as he fled after committing armed robbery. In this case, by defendant's own admission, defendant was "getting the best of [Jay Taylor]" in the fight, and Taylor had "stopped" before defendant reen-

tered the mobile home to get his shotgun. Defendant presented no evidence that he knew the victim kept a weapon in the shed or that the victim reinitiated the fight. Nonetheless, defendant asserts that the victim's words, "I will be right back, you son of a bitch," coupled with the prior altercation, constituted the victim's voluntary participation in defendant's homicidal conduct. It is undisputed that defendant's homicidal conduct consisted of retrieving his shotgun from inside the mobile home, shooting the victim in the back, and firing at the victim again as he was lying on the ground. The victim was not a voluntary participant in defendant's homicidal conduct within the meaning of the (f)(3) mitigating circumstance.

Next, defendant argues that the trial court committed reversible error by refusing to submit, upon written request, two nonstatutory mitigating circumstances.

[35] The trial court submitted the nonstatutory mitigating circumstance that "defendant and James Charles Taylor never established a stepfather/stepson relationship." During the charge conference, defendant agreed that this was "sufficient." Defendant now contends that the trial court erred by not giving the circumstance as originally proposed, that "there was an extenuating relationship between the defendant and James Charles Taylor." We have repeatedly held that "[i]f a proposed nonstatutory mitigating circumstance is subsumed in other statutory or nonstatutory mitigating circumstances which are submitted, it is not error for the trial court to refuse to submit it." *State v. Richmond*, 347 N.C. 412, 438, 495 S.E.2d 677, 691 (1998); *see also State v. Strickland*, 346 N.C. 443, 466, 488 S.E.2d 194, 207 (1997), *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 757 (1998); *State v. Bates*, 343 N.C. 564, 583, 473 S.E.2d 269, 279 (1996), *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 873 (1997). The circumstance that was actually submitted, along with the statutory (f)(9) catchall mitigating circumstance, which was also submitted, allowed the jury to consider and give weight to all evidence presented regarding the nature of defendant's relationship with the victim. Accordingly, the trial judge did not err in failing to submit the additional nonstatutory mitigating circumstance as originally proposed by defendant.

[36] Defendant also contends that the trial court erred by failing to submit as a nonstatutory mitigating circumstance that "defendant continues to have family members, such as his mother, brother, aunts and uncles, who care for and support him." This circumstance, as worded, relates to persons other than defendant. Matters which reflect upon " '*defendant's* character, record or the nature of his par-

ticipation in the offense' " are properly considered in mitigation by the jury. *State v. McLaughlin,* 341 N.C. 426, 441, 462 S.E.2d 1, 9 (1995) (quoting *State v. Irwin,* 304 N.C. 93, 104, 282 S.E.2d 439, 447 (1981)) (emphasis added), *cert. denied,* 516 U.S. 1133, 133 L. Ed. 2d 879 (1996); *see also State v. Cherry,* 298 N.C. 86, 98, 257 S.E.2d 551, 559 (1979), *cert. denied,* 446 U.S. 941, 64 L. Ed. 2d 796 (1980). The feelings, actions, and conduct of third parties have no mitigating value as to defendant and, therefore, are irrelevant to a capital sentencing proceeding. The trial court did not err in excluding this proposed nonstatutory mitigating circumstance.

[37] By two more assignments of error, defendant argues that the trial court committed reversible error by refusing to give peremptory instructions on the existence of all the statutory and several nonstatutory mitigating circumstances. If a mitigating circumstance is supported by uncontroverted and manifestly credible evidence, defendant is entitled, upon request, to a peremptory instruction on that circumstance. *State v. Gregory,* 340 N.C. 365, 415, 459 S.E.2d 638, 667 (1995), *cert. denied,* 517 U.S. 1108, 134 L. Ed. 2d 478 (1996). However, a defendant must timely request such an instruction, as the trial court is "not required to sift through all the evidence and determine which of defendant's proposed mitigating circumstances entitle him to a peremptory instruction." *Id.* at 416, 459 S.E.2d at 667. Further, a defendant must specify a proper peremptory instruction for statutory and nonstatutory mitigating circumstances. *Id.; see also Buckner,* 342 N.C. at 235-37, 464 S.E.2d at 436. A general request for a peremptory instruction on all mitigating circumstances is insufficient. *Gregory,* 340 N.C. at 416-17, 459 S.E.2d at 667.

In this case, defendant did not request peremptory instructions during the charge conference and only raised the issue just prior to closing arguments in the penalty phase of the trial. Defendant did not make a specific request for peremptory instructions for statutory and nonstatutory mitigating circumstances, nor did he make a showing that the evidence supporting any mitigating circumstance was uncontroverted and manifestly credible. Defendant merely raised the issue of peremptory instructions before the trial court and did little more than recite several mitigating circumstances. Even in arguing to this Court, defendant does not point to any specific mitigating circumstance, statutory or nonstatutory, on which the trial court erroneously denied a peremptory instruction after a proper request and a showing of sufficient evidence. We conclude that the trial court did not err in ruling on this issue.

**[38]** By his next assignment of error, defendant argues that the trial court committed reversible error by failing to submit and instruct the jury on a nonstatutory mitigating circumstance, defendant's emotional immaturity at the time of the offense, after agreeing to submit such circumstance for consideration by the jury. The record reveals that defendant initially requested two nearly identical nonstatutory mitigating circumstances: number 7, "The Defendant, though 21 at the time of the offense, is emotionally immature," and number 24, "Defendant's emotional immaturity at the time of the offense reduced his culpability." During the charge conference, defendant agreed to the submission of number 7 only. This mitigating circumstance relating to defendant's emotional immaturity was in fact submitted and instructed on. Therefore, defendant's assignment of error is without merit.

**[39]** Defendant next argues, based on ten assignments of error, that during the capital sentencing proceeding the trial court allowed the prosecutor to make arguments that were improper, inflammatory, prejudicial, and unsupported by the evidence. In reviewing defendant's contentions regarding the guilt phase of his trial, we examined the law applicable to prosecutors' arguments. We note here that "[t]hese principles apply not only to ordinary jury arguments, but also to arguments made at the close of the sentencing phase in capital cases." *Fullwood*, 343 N.C. at 740, 472 S.E.2d at 891. Further, in addition to the wide latitude generally afforded trial counsel in jury arguments, we also recognize that "the prosecutor of a capital case has a duty to zealously attempt to persuade the jury that, upon the facts presented, the death penalty is appropriate." *Strickland*, 346 N.C. at 467, 488 S.E.2d at 208. Applying these principles to the instant case, we find no prejudicial error.

We first note that defendant includes in his assignments of error several pages of arguments directed toward defendant's mitigating evidence, to which defendant did not object at trial. The prosecutor urged the jury, *inter alia*, that defendant's evidence did not establish that he was under the influence of a mental or emotional disturbance, that defendant's capacity to comply with the law was not impaired, and that defendant's size in comparison to the victim's was not a mitigating factor in this case. Upon close scrutiny of the arguments, we conclude that none were so grossly improper as to require the trial court to intervene *ex mero motu*.

**[40]** Defendant also excepts to numerous instances in which his objections to the prosecutor's arguments were overruled.

Specifically, defendant contends that the trial court committed reversible error by allowing the prosecutor to: (1) inject his personal opinion of the significance of the evidence, (2) stress the character of the deceased and the impact of his death on his family, (3) assert the possibility of a new trial for defendant, (4) make improper and inflammatory arguments, (5) stress the societal impact of crime, (6) negate the jury's duty to consider the mitigating circumstances, (7) argue the deterrent effect of the death penalty, and (8) misrepresent the testimony of defendant's mental health experts. After an exhaustive examination of the transcript, we conclude that defendant's contentions are without merit.

However, three of defendant's contentions require further discussion. First, the prosecutor argued to the jury that J.R. Taylor, defendant's stepbrother and the victim's son, walked outside and saw "his father laying there on the ground . . . his life's blood puddled." Defendant objected on the basis that there was no evidence to support the statement. The trial court overruled the objection, stating that "[t]he jury will recall the evidence." We have carefully reviewed the entire record and agree with defendant that there was no evidence to support the prosecutor's assertion that J.R. Taylor saw his father after the shooting. The trial court should have disallowed this statement, as "[i]t is well settled that the trial court is required to censor remarks not warranted either by the law or by the facts." *State v. McCollum*, 334 N.C. 208, 225, 433 S.E.2d 144, 153 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994).

However, even though the prosecutor's argument was improper, defendant is entitled to a new sentencing hearing only if the comment " 'so infected the trial with unfairness' " as to deny defendant due process of law. *Id.* at 223-24, 433 S.E.2d at 152 (quoting *Darden v. Wainwright*, 477 U.S. 168, 181, 91 L. Ed. 2d 144, 157 (1986)). This remark by the prosecutor did not have such an effect. The victim's son testified that he heard a gunshot, and there was substantial evidence that the boy was inside the trailer when his father was killed outside, only several feet away. The evidence clearly established J.R. Taylor's proximity to the scene of his father's murder. We conclude that the prosecutor's statement that J.R. saw the body, while inappropriate, was not prejudicial. The trial court's error in failing to sustain defendant's objection was harmless beyond a reasonable doubt.

**[41]** Next, defendant repeatedly objected to the prosecutor's argument for the death penalty as an appropriate punishment. Defendant

contends that speculation about defendant's future dangerousness was inflammatory and that the trial court erred by allowing it. The record shows that the prosecutor urged the jury to "save someone else's life" and to never "let him put his hands on another gun or another knife and face down another human being who has made him mad." The prosecutor argued that prison would not do defendant any good and that the death penalty would prevent defendant from taking another life. During this argument, the trial court instructed the prosecutor to make it clear that his deterrence argument applied only to this defendant. We have previously held that arguments invoking specific deterrence are proper. *See State v. Syriani*, 333 N.C. 350, 397, 428 S.E.2d 118, 144, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). This argument is rejected.

[42] Finally, defendant contends that the following argument improperly commented on a possible appeal: "You've got to stop this now, ladies and gentlemen. And only you can do it. Don't pick up the paper somewhere down the road and read about a new trial of [defendant]." Defendant objected. Out of the presence of the jury, defendant argued to the court that this implied to the jury that defendant could get a retrial. Defendant requested a mistrial. The trial court stated that it did not interpret the argument that way. The court denied the motion for a mistrial and overruled defendant's objection. We conclude that the trial court correctly interpreted the prosecutor's argument as an extension of his specific-deterrence argument as to defendant, rather than a comment on the appellate process. We decline to hold that the trial court erred in this ruling.

[43] By another assignment of error, defendant contends that his state and federal constitutional rights were violated by the jury's recommendation of a death sentence because it was returned under the influence of passion, prejudice, and other arbitrary factors. Defendant argues that grossly improper arguments by the prosecutor, specifically arguments that implied defendant would get a new trial, get out of jail, and kill again, substantially influenced the jury's recommendation of death. We have already addressed these assertions and found them to be meritless. We have also carefully scrutinized the entire record for any indication of the influence of passion, prejudice, or other arbitrary factors in the jury's recommendation, and having found none, we reject this assignment of error.

Defendant raises six additional issues which he has denominated as preservation issues. As to the first of these, defendant simply reit-

erates the arguments he made concerning allegedly improper and prejudicial comments by the prosecutor concerning the possibility of a new trial. Defendant contends that the trial court erred by denying his motion for mistrial. For the reasons we have already stated, we reject this argument.

[44] Of the remaining five issues raised by defendant, we initially note that at least four

> are not proper preservation issues because they are not determined solely by principles of law upon which this Court has previously ruled. Rather, these assignments of error are fact specific requiring review of the transcript and record to determine if the assignment has merit. Where counsel determines that an issue of this nature does not have merit, counsel should "omit it entirely from his or her argument on appeal."

*Gregory*, 340 N.C. at 429, 459 S.E.2d at 675 (quoting *State v. Barton*, 335 N.C. 696, 712, 441 S.E.2d 295, 303 (1994)). Furthermore, none of these five issues is addressed by any argument or authority whatsoever. "Assignments of error . . . in support of which no reason or argument is stated or authority cited[] will be taken as abandoned." N.C. R. App. P. 28(b)(5).

[45] Having concluded that defendant's trial and capital sentencing proceeding were free of prejudicial error, we turn now to duties reserved exclusively for this Court in capital cases. It is our duty under N.C.G.S. § 15A-2000(d)(2) to ascertain: (1) whether the record supports the jury's finding of the aggravating circumstance on which the sentence of death was based; (2) whether the death sentence was entered under the influence of passion, prejudice, or other arbitrary consideration; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

In this case, the sole aggravating circumstance submitted to and found by the jury was that defendant had been previously convicted of a felony involving the use of violence to the person, N.C.G.S. § 15A-2000(e)(3). None of the jurors found the existence of any submitted statutory mitigating circumstance: that defendant had no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1); that the murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); that the capacity of the defendant to appreciate the criminality of his

conduct or to conform his conduct to the requirements of the law was impaired, N.C.G.S. § 15A-2000(f)(6); or the age of defendant at the time of the crime, N.C.G.S. § 15A-2000(f)(7). The trial court also submitted seventeen nonstatutory mitigating circumstances and the catchall mitigating circumstance, N.C.G.S. § 15A-2000(f)(9), none of which was found by any juror.

The existence of the (e)(3) aggravating circumstance was established at trial through the introduction of the judgment of defendant's prior conviction of assault with a deadly weapon inflicting serious injury, as well as the testimony of the detective who investigated the assault. After thoroughly examining the record, transcripts, and briefs in this case, we conclude that the record fully supports the sole aggravating circumstance submitted to and found by the jury. Further, as stated above, we find no indication that the sentence of death in this case was imposed under the influence of passion, prejudice, or any other arbitrary consideration. We must turn then to our final statutory duty of proportionality review.

[46] We begin our proportionality review by comparing the present case with other cases in which this Court has concluded that the death penalty was disproportionate. We have found the death penalty disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170; *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). No case in which this Court has determined the death penalty to be disproportionate has included the aggravating circumstance that defendant had previously been convicted of a felony involving the use of violence to the person. *State v. Burke*, 343 N.C. 129, 162, 469 S.E.2d 901, 918, *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 409 (1996); *State v. Rose*, 335 N.C. 301, 351, 439 S.E.2d 518, 546, *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 883 (1994). Additionally, although the jury considered twenty-two mitigating circumstances, it found none. We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate.

It is also proper to compare this case to those where the death sentence was found proportionate. *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. However, it is unnecessary to cite every case used for

comparison. *Id.*; *Syriani*, 333 N.C. at 400, 428 S.E.2d at 146. We do note that this Court has previously upheld a sentence of death in cases in which the sole aggravating circumstance found by the jury was the conviction of a prior felony involving the use of violence to the person. *See Strickland*, 346 N.C. at 469-70, 488 S.E.2d at 209-10.

In the instant case, there was sufficient evidence introduced to support this aggravating circumstance. Evidence presented at trial as to the circumstances of defendant's previous conviction of a prior violent felony revealed it was a knife attack on a victim confined to a wheelchair. Additionally, defendant was convicted in this case of first-degree murder under the theory of premeditation and deliberation. Defendant shot his unarmed stepfather in the back and fired the gun twice more as the victim was lying on the ground.

After comparing this case to other roughly similar cases as to the crime and the defendant, we conclude that this case has the characteristics of first-degree murders for which we have previously upheld the death penalty as proportionate. We hold that defendant received a fair trial and capital sentencing proceeding free of prejudicial error and that the death sentence in this case is not excessive or disproportionate.

NO ERROR.

Justice WYNN did not participate in the consideration or decision of this opinion.